# Stinson & Associates, Inc.

7440 Rolling Ridge Way, Westerville, OH 43082     Fax (614) 895-6801    20 South Third Street, Suite 210, Columbus, OH 43215
Phone (614) 309-9727



**NAME:** Robert Ray
**DOB (AGE):** 7-23-63 (53)
**COURT:** United States District Court for the Northern District of Ohio
**CASE NUMBER:** 0647 1:15CR00316-001
**EXAMINER:** Bob Stinson, Psy.D., J.D., LICDC-CS, ABPP
**PURPOSE:** Psychological Evaluation
**REPORT DATE:** 8-11-16

## INTRODUCTION

### Referral Information

Mr. Ray is awaiting sentencing on the above referenced case. His attorneys referred him for a psychological evaluation in preparation for the sentencing hearing.

### Sources of Information & Methods of Evaluation

In completing this evaluation, the following sources of information pertaining to Mr. Ray were used:

Records

(1) Presentence Investigation Report prepared by Allen E. Gold, U.S. Pretrial Services & Probation Officer, prepared 5-19-16, revised 7-1-16.

Interviews

(1) I personally observed and examined Mr. Ray in a private room at the Northeast Ohio Correctional Center in Youngstown, Ohio for approximately 4 hours on 8-2-16.

Testing

(1) Minnesota Multiphasic Personality Inventory, Second Edition, Restructured Form (MMPI-2-RF), 8-2-16.

**Non-Confidentiality Statement**

At the onset of my interactions with Mr. Ray, I explained to him the purpose of the evaluation in simple terms. I also explained to him that the evaluation was not confidential, in that it was being completed at the request of his attorney for a court related matter. I told Mr. Ray that if I was asked to submit a written report or if I was asked to testify in his case or if I was asked to submit a written report and testify in his case, that I would do so. I also informed him that there was no guarantee that my evaluation would be favorable to him or his case. To my satisfaction, he understood these explanations before voluntarily agreeing to proceed.

## BACKGROUND INFORMATION

The following background information as collected from Mr. Ray on 8-4-16 without corroboration from third party sources.

**Birth and Early Development**

Robert Bruce Ray (who has also been called Rob, Bob, and Ray) was born on 7-23-63 in Tucson, Arizona. His mother was 26 years old at the time, and his father was 37 years old. It was Mr. Ray's understanding that his birth process was normal. He stated, "As far as I know [it was normal], but my mom did smoke during the pregnancy." He believed he was born on time and that he met all of his early developmental milestones on time or early, as he noted, "I was reading before I went to school."

**Family**

Parents

Mr. Ray was born to Harriett Anne Ray (nee: Haight). She passed away in 1996 due to lung cancer at 58 years of age. When Mr. Ray was a child, his mother was a stay-at-home mom. When she did begin working, she started out as a secretary and then worked as a nurse's aide and in factories until about a year before she passed away. In describing his relationship with his mother, Mr. Ray said the following:

> "That's difficult to answer. I remember two or three times being spanked. There was not a lot of money. She probably did without to provide for me, but she was not that involved. She was distant. She never saw a tennis match, maybe one or two concerts. She remained distant into my adult years."

Mr. Ray's father is Billy Bruce Ray. He passed away in 2004 due to colon cancer at the age of 78. While he was living, Mr. Ray's father was a mechanical engineer – searching for oil. In describing his relationship with his father, Mr. Ray said, "He was a hard worker. He worked a lot. Talked one time after the divorce [when the defendant was 10 years old]; [that was at the age of] 17—then in my early 20s, then in my mid-20s."

Mr. Ray believed his parents were married shortly before he was born; he believed they married in 1962. They separated from the time Mr. Ray was 6 months old until he was 3 years old. They divorced when he was 10 years old, in June 1974. He did not recall seeing his parents argue frequently, but he noted that money was a stressor for them. In terms of domestic violence, Mr. Ray saw his father be violent once towards a male the father was pushing out of the house after the father caught that guy "him with my sister."

Mr. Ray denied that he had step or foster parents. To his knowledge, neither his mother nor his father remarried after their divorce; however, his father reportedly had a long term friendship with a woman, with whom the father mostly played bridge. Mr. Ray said that he (Mr. Ray), too, had a good relationship with her.

Siblings.

Mr. Ray said he had one sibling, Cynthia (Cindy), who was three and a half years older than him and passed away in 1996. He believed that she married when she was about 35 years old. In describing their relationship, Mr. Ray said that they were "distant" and he added, "Girls mature earlier. What 14-year-old girl wants a 10 or 11-year-old boy [hanging around]? When we were older, she lived a few thousand miles away. I only saw her a few times a year. Not a lot of communication."

Mr. Ray believed he has a maternal half-sibling. Prior to her marriage to his father, his mother reportedly had an affair with a married man, and the two had a child. His mother also traveled to Mexico for an abortion, which he thought occurred between his sister's birth and his own birth, but he was not sure.

Family Dysfunction

In asking about certain family problems, Mr. Ray said, "My maternal grandmother probably had Alzheimer's." He claimed he did not see much of his father's side of the family, but he knew

both his mother and his sister were depressed, and that prior to her death, his sister had been on anti-depressant medication.

When asking about a history of family substance abuse problems, Mr. Ray described his maternal grandmother as a tea totaler. He claimed his mother "would drink," but he did not describe a history of problematic drinking. Mr. Ray further commented, "My sister got high like a lot of people at the time." He recalled that many of his family members experimented with drugs during his late high school years and early adulthood, but that there were no real problems and no one in his family had been to rehabilitation or treatment for drugs or alcohol.

Mr. Ray reported that, "People in [his] family are really good about not talking about things." He said that his father spent half of his life in a hospital, but Mr. Ray to this day has "no idea why." He said he does not know what his father did for most of his 20s and 30s Mr. Ray's aunt was paralyzed from the waist down, but no one ever talked about it or even provided an explanation. Mr. Ray found out his sister had an abortion when she was 15 or 16, but no one ever talked about it or asked about it. He concluded, "If something is uncomfortable, we didn't talk about it."

### Childhood Rearing / Living Arrangements

When asked who raised him primarily, Mr. Ray said his mother raised him in Arizona during his elementary years. Then they moved to Michigan. His mother eventually started working and "maybe it was grandma" who helped raise him after that. Mr. Ray explained he did not have a lot of behavioral problems, so he didn't require much supervision by time he was in high school. In describing his childhood more generally, Mr. Ray said, "Some good, some not so good. I read a lot growing up. I had a Bermuda grass allergy, so I had a doctor's excuse to stay in for recess," implying he was somewhat secluded from other kids.

### Childhood Conduct

When asked about his childhood conduct, Mr. Ray said, "I generally didn't get in trouble." He believed his first fight was when he was 8 or 9 years old, getting into a total of 3 or 4 fights as a kid while living in Arizona. He was asked if he had ever been aggressive towards people, through bullying, threatening, or intimidation, and he replied, "If anything, it was the other way around. I was picked on. I was a chunky little kid. Husky clothing, etc. I was a little odd. I brought Moby Dick to my third grade class." While he acknowledged fighting three or four times as a child, he denied ever using weapons, and he denied ever showing physical cruelty towards

people or animals.

Mr. Ray recalled being destructive towards property as a child. He recalled an instance where he and his friends set fire to an abandoned building. He suggested the fire playing was intentional but the burning of the entire building was by accident. He also remembered driving around when he was 16 or 17 and his friend took a baseball bat to people's mailboxes.

Mr. Ray recalled trespassing in houses that were under construction, but he denied destroying anything in them. He knew that he lied as a child, but he did not think it happened often. He admitted to stealing from at least one store and a neighbor; and he admitted to taking money his mom had given him for the collection plate at church.

While he denied breaking curfew or running away from home as a child, he did admit to being "infrequently" truant from school, starting at the age of 15 or 16 years old.

**Education**
Mr. Ray said that the highest grade he completed was the 12th grade. He graduated from Whitehall High School in Michigan in 1981. He claimed additional education since high school, noting that he did not have an associates or bachelor's degree, but he did take classes in his late 20s and early 30s at the University of Michigan, the Community College of Rhode Island, Brown University (going part-time for four or five years), and the University of Rhode Island. Mr. Ray said that he became interested in computers and had plans to be a computer engineer.

Mr. Ray denied school adjustment problems, and he denied ever being suspended or expelled from school while enrolled in classes.

Mr. Ray said he was never in special education classes. Rather, according to him, he earned a National Merit Scholarship and took college preparatory classes. He earned average grades in elementary school, but became 6th in his class in high school, earning a 3.8 grade point average.

Mr. Ray said he was involved in sports and clubs, including band in junior high and high school, wrestling in junior high, and tennis in high school. He was also part of the National Honor Society and the German Club. In describing his schooling and school years, Mr. Ray said, "I

was reasonably successful. I always had a few friends I hung out with." He stated it was typical for him to spend time with the tennis team and "people who like to get high."

### Military

Mr. Ray said that he served in the United States Navy from 1982 to 1985. He said that he obtained the rank of E5; however, after oversleeping and being AWOL a couple of times, his rank was reduced to E4. He explained, "The first time, it's no big deal; but the fourth or fifth time, you get in trouble."

Mr. Ray said he earned an Honorable Discharge with Physical or Mental Defect. He explained he lost his security clearance after a suicide attempt. However, he said he was "guaranteed," so they could not assign him elsewhere. Therefore, he was given the option to leave, at which time he told the service that he "wanted out." While he denied ever seeing combat, he noted that he was in a ballistic missile submarine, and, as such, wartime and peacetime were "the same."

In describing his military service, Mr. Ray said, "I'm glad I did it. I did somethings most people never get to do. On the other hand, I was in a submarine with guys I know I'm smarter than."

### Employment

Mr. Ray is currently unemployed due to his current incarceration; however, he summarized his employment history by noting, "Every job I've had, I've always gone into management."

Mr. Ray's first job was for the Pacific Arch Chemical Corp, where he worked as a lab tech from 1990 to 1994 or 1995.

Mr. Ray then went to computer school and starting working for Covansys as a Computer Consultant from 1999 to 2002. Mr. Ray said this was the shortest job he held, and he was terminated because he met his third wife, moved, and "basically stopped going to work until I was fired so I could collect unemployment."

Mr. Ray then worked for Terminal Ready Mix from 2003 to 2007, where he drove a concrete mixer, and then became a dispatcher. Mr. Ray left this job when he got a job with the city, which offered him better benefits.

From 2007 until his arrest in 2015, Mr. Ray worked for the City of Lorain in the Black River Waste Treatment Plant, eventually becoming the assistant superintendent. Mr. Ray said he held that job the longest out of all of his jobs and only left due to his arrest.

Mr. Ray identified his job skills by saying, "I'm good with computers and English language skills." He said his current primary means of support is his "wife and girlfriend," but he said the majority of his money is coming from his "retirement account."

### Drugs and Alcohol

Mr. Ray admitted to experimenting with the following classes of substances at some point over the course of his life: alcohol, amphetamines, cannabis, cocaine, hallucinogens, and inhalants.

In regards to alcohol, Mr. Ray said he drank a "fair bit until I got out of the service." He believed over the past 20 years, he had been drunk "a half a dozen times" and that he was 20 years old when he last drove "severely impaired."

In regards to amphetamines, Mr. Ray thought he had used them a half a dozen times while in high school.

In regards to cannabis, Mr. Ray said he tried marijuana "twice since the Navy"—the last time being when he was 25 years old; and he used hash 6 to 8 times.

For the remaining classes of substances, Mr. Ray stated he tried cocaine twice, mushrooms once, and ether one time. While he acknowledged having used opioids and sedatives, he stated that he had been given a prescription for the former that he never finished, and he tried one of his wife's prescription Ambien as a sleep aid on two occasions as it relates to the latter.

### Medical

Mr. Ray described his current health as "mid-level to poor." He said that he has struggled with weight his entire adult life, having lost more than 50 pounds on three different occasions, only to gain it back each time. He stated he arrived at the jail under 200 pounds and has since gained 70 pounds over the past year.

Mr. Ray said that prior to his incarceration he was on medications for low testosterone, high blood pressure, asthma, and GERD. However, while incarcerated, he has only gotten medications for high blood pressure.

### Legal

Mr. Ray admitted to having a juvenile legal history. He stated that when he was 17, he was "out with a buddy and we were way drunk." Mr. Ray was reportedly dropped off at the wrong house and he wandered to a closet. The police were called and he spent 1 ½ to 2 days in the juvenile detention center in Whitehall, Michigan.

Mr. Ray denied having a prior adult criminal record, and he claimed he has not had a traffic ticket since he was 20 years old.

### Mental Health

Mr. Ray described his current mental health as "Depressed, no doubt because of the circumstances. I'm still eating, [but I] sometimes have trouble sleeping. Most of my time is spent reading." Mr. Ray denied ever receiving mental health treatment in the past. However, he did acknowledge being psychiatrically hospitalized in the past at Portsmouth Naval Hospital for "three months or so." Mr. Ray admitted to attempting suicide in 1985. He stated that he cut his wrists, which when shown to me, still bore faint scars. When asked why he had attempted suicide, Mr. Ray said, "I just wasn't happy for a period of time."

## SEXUAL HISTORY

### Trauma History / Sexualized Behaviors

When asked about an abuse history, Mr. Ray described the following:

- He said that he engaged in "typical experimentation" with other children when he was young. As he explained it, when he was about 6 years old and his sister was around the age of 10, he, his sister, 2 girls his sister's age, and a brother (Mr. Ray's age) of one of the girls danced around naked in front of each other. He recalled that his penis and the vagina of one of the other girls touched, but he was not erect and there was no insertion. He said the other boy did the same thing with his sister.

- He remembers learning about strip clubs in elementary school, when he was 6 to 8 years old. He recalled asking about the building because of the lights outside and he was told what it was.

- He said that at age 7 a friend had playing cards with topless women on them and he looked at them. He noted this was his first experimentation with anything resembling pornography.

- He said that in elementary school, while at the drug store, he would "sneak a peek" at cartoon books that had naked women.

- He recalled that around the age of 11 two of his cousins (a male and a female) were "doing exhibitionism" and he touched her vagina, noting that it was "fun" because it was "risky."

- He also remembered that at around age 11, a 12 or 13 year old cousin who was sleeping in the same bed as Mr. Ray cuddled up to Mr. Ray and the cousin had a noticeable erection. Mr. Ray added, "That's as far as it went."

- He said when he was 14 years old and his sister was 18 years old, she went into his bedroom one night, woke him up, and they had sex. He said they had not engaged in flirting or sexualized behaviors up to that point and they didn't talk about it after.

### Marriage / Relationships / Children

Mr. Ray is not currently married, though he is still involved with his ex-wife, Julie Gerth, who is approximately 57 years old. Mr. Ray also has a girlfriend named Kim Rosso, who is 50 years old. When asked if his ex-wife and girlfriend knew about each other, Mr. Ray said, "Pretty much. It's not like I told them everything in detail." He added, "Kim always new about Julie, [but] Julie found out about Kim after the arrest." Mr. Ray dated Ms. Gerth for two years after his second marriage, and he has dated Ms. Rosso for three years, after the two met on the website, Ashley Madison.

Mr. Ray said that he has been sexually active since he was 14 years old. He acknowledged that "pornography has not been good for me my whole life. It interfered with four relationships."

Mr. Ray said that he was married two times prior to his most recent marriage. He said that he was married to Linda Lawrence who was four years younger than he was from 12-23-88 to 1993. He claimed, "We started growing apart, having less sex, and more work. We were more distant. She wanted kids. I didn't." Mr. Ray was then married to Kim Andriozi who was 6 years older that he was from 1995 to 2000 or thereabouts. He claimed their relationship ended because he set up hidden cameras and had "house guests" over. His wife found some of the videos, which reportedly included her sister and her sister's family (including children) naked.

### Sexual Offending / Offenses Charged

A detailed presentence investigation report was completed by Allen E. Gold. It is assumed counsel is familiar with the contents of that report so the details are not included here, but they are incorporated by reference.

Mr. Ray told me pornography has been a "lifelong" problem for him. He recalled stealing Playboy magazines 4 or 5 times starting around the age of 16—once from a store and a couple times from a neighbor. He said he found it titillating after he turned about 16 years old. He started visiting adult video stores after he turned 18. He got into child porn in the "late 90s—with the rise of the internet." But as noted above, even before the internet, he was accessing pornography via magazines and videos.

Other than his period of incarceration, Mr. Ray said the longest he has gone without pornography during his adult life has been about "a month or so." He described some "addiction like" behaviors, including (1) being unsuccessful in his efforts to cut down his use (at times, throwing his collection away and even burning everything only to quickly return to using and collecting), (2) spending a large amount of time (e.g., waking at 2:00 a.m. to masturbate, day dreaming about sex, etc.), and (3) having pornography adversely affect his relationships (he noted that he found new relationships "stimulating and new" for about 6 to 12 months, after which he typically was not satisfied and turned more to pornography; some of his relationships ended due to his pornography and voyeurism).

Mr. Ray admitted to having a sexual attraction to "a lot of different things." He noted that he had his pornography collection categorized (e.g., amateur, inter-racial, fetishes with sub-fetishes). He ultimately said, "I was attracted to all of it, though by volume, he thought he had more inter-

racial and amateur pornography—perhaps, he suggested, because it was just more available. Mr. Ray acknowledged finding certain "taboo" things and topics arousing, such as Voyeurism. He admitted to being sexually aroused by children, too—more so older yet still pre-pubescent children than, say, toddlers and infants. He thought 95% of his child porn was of girls.

Mr. Ray said he once "dabbled" in trading pornography, but stopped doing that after there was a "huge bust." He thought he likely engaged in internet pornography, including child porn, for as long as he did without getting caught because he never shared, posted, or did peer-to-peer; he, for the most part, "just downloaded." He cited the various technologies that have developed over time and his risk-reward assessment in using the various technologies, thinking he was "reasonably safe if he didn't do anything stupid."

Mr. Ray said he has explored masochism with a previous girlfriend. He was also into "swinging" for "6 months or so." He has engaged in voyeurism (through the use of hidden cameras), according to him, 8 to 10 times. He admitted to taking pictures of kids on line. He denied any live face-to-face contact offenses with children, though he acknowledged accusations have been made and a polygrapher concluded Mr. Ray was "deceptive" as it related to questions about alleged contact offenses. When asked about it by me, Mr. Ray claimed he was rubbing the small of his granddaughter's back when she repositioned herself and, unbeknownst to him, his hand ended up "in the crack near her vagina." He was not, to my satisfaction, able to explain how he did not know his hand / fingers were "in the crack near her vagina."

Mr. Ray described the volume of his pornography collection as a reflection of his more generalized "digital hoarding." He explained, for example, that he has 20 seasons of Law and Order episodes organized and categorized digitally but he has only watched one season. Similarly, he said he has every episode of Big Bang Theory, every season of House, and most episodes of Two and a Half Men. He believes he has 1,000 to 2,000 CDs worth of MP3s, and somewhere between 3,000 and 5,000 books. He denied ever being obsessive about anything else in his life, but as it relates to digitizing things, including his pornography, he was. Thus, he concluded that his volume of pornography was attributable in part to him being "reasonably good at downloading and categorizing" and the sheer length he had been at it—starting in the 90s (around 1994) before stopping for a couple years and then starting up again in 2001 or 2002, continuing uninterrupted until his arrest.

As it related to his viewing and collecting of pornography, it appears he spent more time collecting it and categorizing it than he did watching it, though—to be sure—he did view it as well. He acknowledged this has led to a life where "I keep things from people. Like my porn or infidelity. I didn't lie, but I hid things." He acknowledged being reckless and irresponsible. As he said, "I would say I ignore potential ramifications of potential consequences. It's more poor judgment than impulsivity. I'm good at compartmentalizing. Even now, I'm still involved with two women. I am happy with each of them, when with one or the other. But I know it can't last. It's a slow motion train wreck." He also admitted, "I have difficulty forming intimate relationships. I can only get so far, then no farther. I've been married three times. Almost entirely my fault. How to fix this? God, I wish I knew." He did report frustration that treatment is not offered to him—even through a privately paid therapist—in his current setting. He wishes for and is currently receptive to the idea of treatment. Notably, if he were to participate in and successfully complete treatment, this could significantly reduce his risk of future offending.

## MENTAL STATUS EXAMINATION

Mr. Ray was appropriately dressed in jail attire, presenting with good grooming and hygiene. He appeared to be of average height but overweight. He was pleasant and fully cooperative. Rapport was quickly established and easily maintained. Mr. Ray was fully alert and oriented. He was attentive and focused. No problems were noted in his memory or other cognitive abilities. He presented as a person of at least average intelligence and, consistent with his report that he reads a lot, likely above average vocabulary. There were no problems with his speech and language abilities, though he was a bit long-winded at times. His mood and affect were both stable and without obvious impairment, though he reported feeling depressed and psychological testing indicated some risk for suicide. There was no evidence of psychosis, such as hallucinations, delusions, or disorganized thinking. His ability to reason was good. His judgment was fine at the time of the evaluation, though it has been impaired in the past, particularly as it relates to his offending behaviors. His insight was fair.

## PSYCHOLOGICAL TESTING

**Minnesota Multiphasic Personality Inventory - Second Edition, Restructured Form (MMPI-2-RF)**

The MMPI-2-RF, which is a standardized measure of personality and psychopathology, was administered to Mr. Ray. The MMPI-2-RF consists of 338 declarative statements, to which the examinee must answer either true or false depending on the examinee's own perceptions and

opinions.

The interpretations of the MMPI-2-RF presented in this report should be conceptualized as hypotheses and should not be used in isolation from other information on this matter. The interpretive statements herein are primarily computer-generated, actuarial, and expert predictions based on test patterns. The interpretations reflect characteristics of persons who have provided test response patterns that are similar to those of the individual tested in this evaluation. Test results are probabilistic in natures and should be interpreted with caution, in that it is impossible to determine, from test results alone, if these patterns and deficits preexisted the events in question, or are the sequelae of the events.

### Validity Considerations

Scores on the MMPI-2-RF validity scales raise concerns about the possible impact of over-reporting on the validity of this protocol. With that caution noted, scores on the substantive scales indicate somatic complaints and emotional, thought, and interpersonal dysfunction. Somatic complaints relate to malaise. Emotional-internalizing findings include suicidal ideation, demoralization, depression, and helplessness and hopelessness. Dysfunctional thinking relates to ideas of persecution. Interpersonal difficulties include passivity and social avoidance.

There are no problems with unscorable items in this protocol. Mr. Ray responded relevantly to the items on the basis of their content. While there are no indications of under-reporting in this protocol, Mr. Ray did generate a larger than average number of infrequent responses to the MMPI-2-RF items. This level of infrequent responding may occur in individuals with genuine psychological difficulties who report credible symptoms. However, for individuals with no history or current corroborating evidence of dysfunction it likely indicates over-reporting.

### Substantive Scale Interpretation

The following interpretation needs to be considered in light of cautions noted about the possible impact of over-reporting on the validity of this protocol.

In terms of Somatic and Cognitive Dysfunction, Mr. Ray reports experiencing poor health and feeling weak or tired. He is, indeed, likely to be preoccupied with poor health and to complain of sleep disturbance, fatigue, and sexual dysfunction.

In terms of Emotional Dysfunction, Mr. Ray reports a history of suicidal ideation and/or attempts. He is likely to be preoccupied with suicide and death and to be at risk for current suicidal ideation and attempts. His responses indicate significant emotional distress. More specifically, he reports a significant lack of positive emotional experiences, pronounced anhedonia, and marked lack of interest. He is very likely to be quite pessimistic, to lack energy, and to display vegetative symptoms of depression (though they were not obviously present at the time of my evaluation). Mr. Ray reports feeling sad and unhappy and being dissatisfied with his current life circumstances. He is likely to complain of feeling depressed. He also reports feeling hopeless. He is likely to feel overwhelmed and that life is a strain, to believe he cannot be helped and gets a raw deal from life, and to lack motivation for change.

In terms of Thought Dysfunction, Mr. Ray reports significant persecutory ideation such as believing that others seek to harm him. He is likely to be suspicious of and alienated from others, to experience interpersonal difficulties as a result of suspiciousness, and to lack insight. In contrast to the test results, Mr. Ray interacted fine with me for a 4 hour period.

While there are no indications of maladaptive externalizing behaviors in this protocol, Mr. Ray reports being unassertive and is indeed likely to be passive and submissive in interpersonal relationships. He also reports not enjoying social events and avoiding social situations, including parties and other events where crowds are likely to gather. He is very likely to be introverted, to have difficulty forming close relationships, and to be emotionally restricted.

## DIAGNOSES (AT THE TIME OF EVALUATON)

- Pedophilic Disorder
- Voyeuristic Disorder
- Fetishistic Disorder
- Sexual Masochism Disorder
- Major Depressive Disorder – Recurrent - Mild

## SUMMARY AND CONCLUSIONS

In summary, Mr. Ray is awaiting sentencing in the United State District Court for the Northern District in Ohio. He was referred to me for a psychological evaluation in preparation for his sentencing hearing.

There are some factors in Mr. Ray's background that could be of mitigating value. For example, he came from a household that was, during his critical sexual developmental years, absent a father. He had a mother who was emotionally distant and a family that did not talk much. By no later than age 6, he was exposed to "sexual play" that went beyond appropriate limits, though to this day Mr. Ray characterizes it as "normal." He was exposed to pornography during his childhood. According to him, his 18 year old sister had sex with him when he was 14. He has had other conditions, including past depressive episodes, an attempted suicide, and intimacy deficits in his relationships that have gone untreated. He reported that he is receptive to the idea of treatment at this point. As noted previously, if he were to participate in and successfully complete sex offender treatment, this could substantially reduce his risk of reoffending. Among other things, treatment could address how to manage his arousal patterns without offending. That is not to say Mr. Ray is without risk factors. I have noted them throughout this report. However, he is receptive to treatment, treatment can be effective, and even deviant sexual arousal patterns can be managed with appropriate treatments, supervision, and support.

**Respectfully Submitted,**

*[signature]*

**Bob Stinson, Psy.D., J.D. LICDC-CS, ABPP**
**Board Certified Forensic Psychologist**